In the Matter of JUNE B., Appellant, v EDWARD L., Respondent.

First Department, July 10, 1979

## APPEARANCES OF COUNSEL

*Sidney Marks* for appellant.

*James J. Cally* of counsel (*Cally & Cally,* attorneys), for respondent.

## OPINION OF THE COURT

KUPFERMAN, J.

The petitioner-appellant in 1977 moved in the Family Court for an order of filiation, declaring the respondent Edward L. to be the natural father of her son who bore his name, Edward L., Jr. On the consent of the parties, an order of filiation was entered into, with provision for support for the son until he reaches the age of 21 years. Obviously, the petitioner from the very beginning believed the respondent to be the father of her child, and he readily accepted the responsibility. Clearly, he is entitled to all the rights of a natural father. *(Caban v Mohammed,* 441 US 380; see Silk, Adoptions—Making the Unwed Father Equal, NYLJ, May 7, 1979, p 1, col 2.)

Some 10 months after the entry of the order of filiation, the petitioner mother moved for an order vacating and setting it aside and granting a new hearing upon alleged newly discovered evidence. Together with the petition, which has an affidavit by counsel only and none by petitioner herself,* there was a letter from a physician stating that it was her understanding that Mr. L.'s blood type is O positive, and that the mother and the child have blood type AB negative, in which case parentage for Mr. L. is excluded. (See Schatkin, 1 Disputed Paternity Proceedings [4th ed], §§ 5.05, 5.10.)

The dissent would remand for a hearing on that question, but to what avail? The motive for the petitioner mother's subsequent change of heart is undoubtedly, as set forth in the dissent, her difficulties with the respondent and his having initiated a proceeding under section 651 of the Family Court Act, seeking custody of the child. (See *Braiman v Braiman,* 44 NY2d 584, 589; see, also, "The Woman Pays", The Bronx Bar Advocate, vol 25, No. 5 [Nov.-Dec., 1978], p 115; cf. *Orr v Orr,* 440 US 268.)

At common law, there was a presumption of legitimacy *in marriage,* even though the wife was adulterous, given the cohabitation of the parties in conjugal relation at the time of conception. (Fisch, New York Evidence [2d ed], § 1129; Richardson, Evidence [10th ed], § 59.) The common-law rule has been abolished in New York State (Family Ct Act, § 531),

---

* On a matter such as this, there should be an affidavit by the party involved and not merely by counsel. *(Capelin Assoc. v Globe Mfg. Corp.,* 34 NY2d 338, 342; *Pathmark Graphics v J. M. Fields, Inc.,* 53 AD2d 531, mot to dismiss app granted 40 NY2d 1093.)

allowing a husband to attempt to establish his nonpaternity. One way to help establish exclusion of a possible father is the blood grouping test. Usually, the purpose of the test is to aid the putative father in establishing his blamelessness. In fact, sections 418 and 532 of the Family Court Act provide for a blood test "on motion of the respondent".

Shakespeare confirmed that "it is a wise Father that knows his own child" (The Merchant of Venice, act 2, scene 2). Unlike the mother, this respondent submits his own affidavit to the effect that the parties were living together at the time of conception, and in this case the father has assumed his responsibility, and the mother, when it suited her purpose, chose to foist responsibility upon him. The child benefits by the support provided, and it is the interest of the child with which we are most concerned. *(Matter of Orlando F.,* 40 NY2d 103.)

With respect to the best interest of the child, it has been recently stated by Judge COOKE (now Chief Judge) that there is a "heavy burden of constitutional magnitude on one who would terminate the rights of a natural parent" *(Matter of Corey L v Martin L,* 45 NY2d 383, 386-387). Surely, such postulate is reinforced where, as here, there is a determination concurred in by both parties to the proceedings and by the court, resulting in a judgment. If there is additional evidence, and we do not have anything more than speculation, it is not newly discovered but rather recently sought.

The petitioner mother having sought the jurisdiction of the Family Court to establish paternity and having obtained the benefit of the judgment so secured, should now be estopped from seeking to have the court annul the judgment. *(Matter of Montelone v Antia,* 60 AD2d 603; cf. *Psaroudis v Psaroudis,* 27 NY2d 527.)* The more so, when she offers no alternative possibility but merely suggests the respondent's possible exclusion to the detriment of the child's parentage. The child should not be kept in limbo. *(Matter of Sanjivini K.,* 40 NY2d 1025, 1026-1027.)

The order of the Family Court, New York County (THURSTON, J.), entered on or about December 20, 1978, should be affirmed, without costs.

LUPIANO, J. (dissenting). June B., the mother of a male child born out of wedlock on February 28, 1974, initiated a paternity proceeding in the Family Court, New York County,

by petition sworn to August 5, 1977, against respondent Edward L., alleging that he was the father of said child and seeking a declaration of paternity and an order of support. She also sought concomitantly with such relief an order of protection, alleging harassment on respondent's part "in that on 8/3/77, 9:30 P.M. at Petitioner's apartment, Resp. did break the door and did state to Petitioner 'I'm coming to get you'. Petitioner took that to mean a physical assault upon her person and left the apartment via window, in fear." Thus, some three and one-half years after the birth of the child, the paternity proceeding was initiated by the mother alleging sexual relations with respondent during a period commencing February, 1973 and terminating April, 1977. It thus appears that it was soon after the termination of sexual relations between the parties that the paternity proceeding was undertaken, coupled, as already noted, with a claimed need for a protective order.

At this point, it is well to recall the purpose of proceedings initiated in the Family Court to establish the paternity of a child (Family Ct Act, § 511 et seq.). "The purpose of paternity proceedings is to secure support for children born out of wedlock and to indemnify the community against the possibility that they might become public charges, and it is said that they are in derogation of the common law * * * [I]t is said that statutes governing filiation proceedings should be liberally construed so as to protect the welfare of the child" (15 NY Jur, Domestic Relations, § 452). "The evolving theory underlying article 5 of the Family Court Act recognizes the protection of the welfare of out-of-wedlock children as the primary purpose of filiation proceedings (Schaschlo v Taishoff, 2 NY2d 408; Committee Comments, McKinney's Cons. Laws of N.Y., Book 29 A, Part I; Family Ct. Act, § 511)" (Matter of J. Children, 50 AD2d 890, 891).[1]

---

1. At common law, an "illegitimate child" was patently discriminated against and possessed little by way of "rights" (see Halsbury's Laws of England, vol 3, Bastardy and Legitimation [3d ed], p 85 et seq.; see, also, Hooper, The Law of Illegitimacy [1911]). (N. B. Utilization of the phrase "illegitimate child" is solely limited to the historical context, and hereinafter and apart from historical review the term "child born out of wedlock" is employed as mandated by General Construction Law, § 59.) Described as filius nullius—nobody's child; filius populi—the child of the people; and heres nullius—nobody's heir, he could not inherit from his parents, was not entitled to their support, was not legitimated by the subsequent intermarriage of his parents and was thrown upon the parish for aid and succor. The financial burden imposed upon the community resulted in enactment of a statute requiring both parents to support the child, the Poor Law Act of 1576 (referred to as Stat 18 Eliz, ch 3 [1576]).

The statute defines a "child born out of wedlock" as "a child who is begotten and born out of lawful matrimony" (Family Ct Act, § 512, subd [a]). "Under definitions in earlier statutes concerning paternity proceedings, it was held that a child born out of wedlock or a natural child as defined by such statutes was in effect a child born out of lawful matrimony, or born to a married woman under conditions where the presumption of legitimacy was not conclusive and had been rebutted" (15 NY Jur, Domestic Relations, § 453). However, in New York, legitimization may be conferred on children who were not so born by virtue of a statutory provision which declares that "[a] child [t]heretofore or [t]hereafter born of parents who prior or subsequent to the birth of· such child shall have entered into a civil or religious marriage, or shall have consummated a common-law marriage where such marriage is recognized as valid, in the manner authorized by the law of the place where such marriage takes place, is the legitimate child of both natural parents notwithstanding that such marriage is void or voidable or has been or shall [t]hereafter be annulled or judicially declared void" (Domestic Relations Law, § 24, subd 1). Other States, as for example, Louisiana, provide for other methods of legitimation, such as by acknowledgment of the child's legitimacy (despite birth out of wedlock) by the putative father (see *Matter of Slater*, 195 Misc 713).

An order of filiation and support which adjudges that some person other than· the mother's husband is the father of the child (born out of wedlock) and which orders him to provide support for the child is not a binding adjudication of illegitimacy and does not establish the status of the child (see 15 NY Jur, Domestic Relations, § 461). In *Commissioner of Public Welfare v Koehler* (284 NY 260, 266-267), the Court of Appeals declared: "Paternity proceedings are brought *to enforce a statutory duty* imposed upon the father of a natural child to whom the father at common law owed no duty. [Citation

---

This statute was a police measure designed to relieve the community of support for the child born out of wedlock and did not confer any court rights on the child. In this statute we perceive the parent act of subsequent legislation in this country and in England to obtain support for the child born out of wedlock. The primary purpose of such legislation was the relieving of the public's support of the child. The welfare of the child was a secondary consideration except insofar as support itself was concerned. It is interesting to compare the common-law view of a child born out of wedlock with the older and more humanistic attitude expressed in the Talmud (see Kiddushin 73a, 73b).

omitted.] Such a proceeding may be brought by the mother or if the child 'is or is likely to become a public charge' by a public official. [Citation omitted.] The child is not a necessary party to the proceedings nor is the husband of the mother. The order made in such a proceeding does not constitute an adjudication binding on them or persons claiming through or under them that the child is or is not the legitimate offspring of married parents. An order adjudging that some person other than the mother's husband is the father of the child and ordering him to provide for its support is, it is plain, not a binding adjudication of illegitimacy. It does not establish the status of the child nor would it be competent evidence to establish illegitimacy in any proceeding to which others are parties" (emphasis supplied).

Consequently, the ensuing discussion of the issues raised by the appeal herein is to be viewed as divorced from any question relating to the legitimacy of the child born out of wedlock.

In consequence of the paternity proceeding commenced by the mother, petitioner herein, an order of filiation and support was entered on or about November 7, 1977, respondent Edward L. having admitted the allegations of the petition. The order recites that the Family Court examined and inquired (as it must) into the facts and circumstances of the case and declared respondent to be the father of the child and directed that he pay $30 weekly for child support. At this time section 564 of the Family Court Act was not in effect, said statute to take effect June 19, 1978. This new enactment permits under appropriate circumstances the waiving of the requisite hearing by the father. Concomitant with the initiation by petitioner of the paternity proceeding, she obtained an order of protection from the Family Court, dated August 5, 1977, which directed respondent not to remove the child from the care and custody of petitioner until further order of the court and directed him to "refrain from acts constituting assault, menacing, reckless endangerment and/or disorderly conduct directed against the person of the Petitioner and child."

The filiation order entered on or about November 7, 1977, provided for visitation by respondent. However, on or about January 19, 1978, petitioner sought to modify the support order to provide a further order of protection, alleging that respondent on January 15, 1978 endeavored to forcibly remove the child in circumstances imbued with vile language and

threats. This resulted in an order of protection, dated January 19, 1978, to be effective January 19 to March 6, 1978, which provided that respondent not "assault, menace, etc. the petitioner" and "not to remove child from care and custody of petitioner." Visitation was also suspended until March 6, 1978. However, on February 3, 1978, petitioner June B. initiated a petition for violation by respondent of the order of protection, alleging that respondent on February 1, 1978 in person threatened to remove the child and shortly thereafter continued these threats by miscellaneous telephone calls, an alleged visit to a police station and an attempt to physically take the child from petitioner. A warrant of arrest issued from the Family Court, dated February 3, 1978, directed against respondent.

Subsequently, it appears that respondent obtained dismissal of petitioner's supplemental petition for violation of the order of protection by order dated July 10, 1978. This order also provided for visitation to resume on the first Wednesday in September and both parties were directed not to undermine the other's relationship with the child. Thereafter, on August 7, 1978, the court issued an order of protection directing that "each party will not take the child outside of the jurisdiction."

Prior thereto, on July 20, 1978, by order to show cause, respondent initiated a proceeding under section 651 of the Family Court Act seeking custody of the child, alleging his status as father by virtue of the order of filiation. The gravamen of respondent's claim to custody was predicated upon the alleged proposal by petitioner June B. to leave this jurisdiction to prevent respondent's visiting with the child.

Against this background, petitioner by order to show cause dated September 8, 1978, moved to have the order of filiation set aside on the basis of evidence which she asserts would unequivocally disprove the claim of paternity by respondent. This motion was initiated just prior to the return date of respondent's custody petition (Sept. 11, 1978). The moving affirmation in support of petitioner's request to have the order of filiation set aside was submitted by court-appointed counsel (18-B counsel) to the effect that medical evidence in the form of blood tests would demonstrate beyond any doubt the fact that respondent is not the father of this child. A letter from a doctor at Columbia-Presbyterian Medical Center was submitted in support which states on information and belief as to respondent that his blood type is 0 positive and, apparently on

knowledge, that the mother's blood type is AB negative and the child's is the same. If this assertion is correct, then petitioner June B. would appear to be in a position to demonstrate that respondent is indeed not the father. Further, petitioner's counsel asserts that inquiry with Fran Levitt, CSW social worker at Roosevelt Hospital, confirmed this alleged failure of paternity. He requested on his client's behalf a hearing on the merits with respect to petitioner's contention that respondent is not the father.

Shortly after seeking this relief, petitioner initiated a further petition to modify the support order to provide her with an order of protection. She claimed that since initiating her motion to have the filiation order set aside, respondent has harassed her *and* her children (including the child who is affected by the order of filiation) in that "[o]n September 10, 13, and 17, 1978, Respondent did bring the police to petitioner's apartment * * * demanding custody of child Edward. On several occasions, during the past two months, Respondent did follow the children Candy, David and Raymond in and out of public places seeking to coerce information from them about the whereabouts of their mother. Petitioner fears for the safety of herself and for the safety of her children; particularly Edward. Respondent has threatened to remove Edward from the jurisdiction of NYC and take him to Texas." An order of protection dated September 18, 1978, issued by the Family Court, again forbade respondent to assault, menace, harass, etc., petitioner and directed him not to interfere with petitioner's custody of the children.

Against this backdrop and in opposing petitioner June B.'s motion to set aside the order of filiation and support, respondent asserts that it is petitioner who seeks to evade the court's jurisdiction by moving to another jurisdiction so that visitation rights of respondent could be flouted. He attacks the letter submitted by the doctor as valueless with the conclusory assertion that it is "hearsay". He accuses the doctor as part of petitioner's "scheme" to mislead the court. Nowhere does respondent attempt to dispute the assertions made in the doctor's letter as to his blood type or the blood types of the mother and child.

By order entered December 20, 1978, the Family Court, in an order entitled "All Purpose Short Order", denied petitioner's application to set aside the paternity order. No reasons were given. No findings made. No conclusions of law drawn.

The order simply recites the denial based on consideration of the arguments. Thus, despite the fact that in less than one year after the entry of the order of filiation and support, the mother of the child desired the opportunity to demonstrate that respondent is not the father and despite the litigious history between the mother and respondent with its obvious "fallout" effect on the child, no meaningful opportunity was apparently afforded to "air" this claim of the mother.

Parenthetically, it is noted that while an appeal from this order of the Family Court denying petitioner's application to set aside the order of filiation was pending, petitioner moved before a Justice of this court for a stay of all proceedings in the Family Court pending determination of this appeal, alleging that respondent by his threats, harassment, etc., has created a health hazard to the children of petitioner. In support of this request, petitioner submitted letters of the chief resident, division of child and adolescent psychiatry, NYU Bellevue Medical Center, and a social worker of the children and youth comprehensive medical program averring a basis for concluding that respondent might pose a danger to the physical and mental health of the children. A stay was granted by a Justice of this court by order dated March 6, 1979.

Despite the pragmatic aspect of an order of filiation and support as it relates to financial or economic circumstances relevant to the child born out of wedlock, it is equally clear that such child is vitally affected by the filiation itself, i.e., the judicial imprimatur placed on the relationship between the child and the alleged putative father. Indeed, it may be argued that the putative father's rights arising out of the order of filiation are no way inferior to the natural mother's (see *Caban v Mohammed*, 441 US 380; see, also, Social Services Law, § 384-c). Accordingly, it cannot be doubted that of paramount concern in such proceedings is the best interests of the child. "From birth an infant is considered to be a ward of the state, the state standing in relation of parens patriae to infants and being vitally concerned with their welfare * * * It is also frequently stated that infants are wards of the court, the court representing the state. Courts of general equity jurisdiction have the obligation of protecting infants, and their rights * * * upon their own initiative whenever they deem it necessary" (28 NY Jur, Infants, § 3).

Common sense dictates that filiation proceedings were envisioned as vehicles for the affixing of the financial obligation of support on the alleged putative father in a full adversarial context. Accordingly, where the alleged putative father chose not to deny, but to admit paternity, the search for truth envisioned by such adversarial context was not to be deemed abandoned, but the court, regarding the child born out of wedlock as its ward and retaining at all times the tenet that the best interests of the child be observed, was impelled to satisfy itself as to the truth of the allegations of paternity.

Section 532 of the Family Court Act provides with respect to paternity proceedings (cf. Family Ct Act, § 418, relating to support proceedings) in pertinent part, as follows: "The court, on motion of any party, shall advise the parties of their right to a blood test and shall order the mother, her child and the alleged father to submit to one or more blood grouping tests by a duly qualified physician to determine whether or not the alleged father can be *excluded* as being the father of the child, and the results of such tests may be received in evidence *but only in cases where definite exclusion is established*" (emphasis supplied). Considerations of justice and fairness not only to the parties, the mother and the alleged putative father, but also to the child, may well dictate the granting, where warranted, of an application to reopen a paternity adjudication. Indeed, in *Matter of Leanna M. v Douglas J.* (35 AD2d 551) the Second Department permitted reopening of a paternity proceeding to the extent of directing, at the alleged putative father's behest, a blood grouping test some four years after the order of filiation was entered. It was observed by said court (p 551) that "[c]onsiderations of whether the * * * relief requested should be granted, i.e., a new trial of the paternity issue itself, may well be postponed until the completion of the blood test." To reiterate, the endeavor by petitioner to set aside the filiation order was initiated within only 10 months after entry of such order (cf. *Matter of Elizabeth E. v Leary*, 63 Misc 2d 857). The circumstances surrounding the legal representation, advice, and absence of invocation of the blood grouping test authorized by section 532 of the Family Court Act at the original consent filiation proceeding are not delineated or alluded to in any manner on this record. Financial considerations inherent in the support dimension of the order of "filiation and support" should not and must not dim the responsibility implicit in the filiation aspect of such order.

Obviously, the statutory authority conveyed upon the court by virtue of section 532 of the Family Court Act carries with it the implied authority for the court to act in proper circumstances in the best interests of its ward, the child, in directing a blood test. To hold otherwise would, in effect, exalt form over substance. Suffice it to say, on this record, at least one party, the petitioner, advances the right to have a blood grouping test conducted. May she obtain this relief remains the central issue.

Accordingly, the facile assertion that the letter from a doctor at Columbia-Presbyterian Medical Center submitted by petitioner (relevant to the exclusion of respondent as father of the child) is of no value because it does not constitute newly discovered evidence, i.e., evidence which could not have been discovered with proper diligence before the trial, is sheer bootstrap.

What petitioner is asking for and urging as in the best interests of the child is a hearing to determine whether the Family Court in its proper discretion should reopen the paternity proceeding to the limited extent of directing a blood test. She has not been afforded such hearing and the denial of same constitutes an abuse of discretion on the part of the Family Court, as a matter of law, having due regard for the circumstances delineated above. Recognition of the workload and working conditions of the Family Court when related to the nonadversarial overtones of the paternity proceeding, the evident and continuing deteriorating relationship between the parties, the overtones of possible damage to the mental and physical well-being of the child (and to the other children) of petitioner, the short lapse of time between the entry of the order of filiation and petitioner's endeavor to now obtain the blood test provided for by section 532 of the Family Court Act —all conspire to dictate a scrutiny and searching examination into the propriety of reopening the paternity proceeding at this time. After all, it is not only a putative father who is "saddled" with the support of a child in a paternity proceeding, the child is also "saddled" with the father.

Parenthetically, a pragmatic observation—it was not intended by the Legislature to enable circumvention of the adoption law and its stringent requirements by recourse to a bogus paternity proceeding—it was the legislative intent that the natural father of a child born out of wedlock undertake the financial support of that child, not that one not the

natural father undertake such obligation and relationship. Respondent is now in the eyes of the law father of the child by virtue of the filiation order. His assurance that the child is flesh of his flesh because of physical resemblance and his former relationship with the child's mother does not comport with a studied avoidance of the requirement of a blood test. He is, as stated, the father, but it may well be that science, if given the opportunity, will say "no, he is not." The issue is simply whether science should be given that opportunity.[2]

Essentially, the difference between the majority position and the view of the dissent is that the majority regard the record herein as adequate for a reasoned determination of the appeal, at least insofar as affirmance of the Family Court order is concerned. However, the narration of the circumstances contained in the record herein, as set forth in this dissent, is complete. What is immediately obvious is the absence of critical relevant facts upon which this court is asked to make an appellate adjudication which will have far-reaching consequences for the child. There is, for example, no transcript of proceedings of the hearing which resulted in the order of filiation and support, although it is assumed such hearing was held. There is no showing as to whether petitioner and respondent, or either of them, were represented by counsel. There is no showing as to whether the Family Court gave the required allocution to respondent informing him of the right to remain silent, of the right to a blood test, etc. There is a suspension of visitation by the respondent by virtue of an order, dated January 19, 1978, and a subsequent restoration of visitation

---

**2.** The right of either party to a paternity proceeding to have blood grouping tests performed is a substantial one (see 15 NY Jur, Domestic Relations, § 460). In Richardson, Evidence (10th ed, § 381) it is noted that "[b]lood grouping tests are relevant on the issue of paternity or identity, and there are several statutes in New York which authorize an order for a blood grouping test * * * If there is no reason to doubt the competency of the expert who conducted the blood grouping test or to doubt the accuracy of the test itself, a negative result will be deemed conclusive. Clark v. Rysedorph, 281 App. Div. 121, 118 N.Y.S.2d 103." The following statutory enactments provide for blood grouping tests: sections 418 and 532 of the Family Court Act; CPLR 3121.

Further, the circumstances underlying a *consent* filiation order, the diligence exercised by the moving party, the probability of a changed result and the interconnected inquiry of whether substantial justice has been done and what is in the best interests of the child when viewed in the context of the development of truth, mandate affording to petitioner mother a fair opportunity to persuade at a full hearing that reason and justice and truth require reopening of the paternity proceeding to the extent that blood grouping tests be performed (cf. *Delagi v Delagi,* 34 AD2d 1005; *McCarthy v Port of N. Y. Auth.,* 21 AD2d 125).

by order dated July 10, 1978, to take effect on the first Wednesday in September, both orders emanating from different Judges of the Family Court, and both changes in visitation being arrived at apparently without recourse to a psychological examination and evaluation of petitioner and respondent by the Bureau of Mental Health Services. Note is taken of section 255 of the Family Court Act which states, in pertinent part: "It is hereby made the duty of and the family court or judge thereof may order, any agency or other institution to render such information, assistance and cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act. The court is authorized to seek the cooperation of, and may use, within its authorized appropriation therefor, the services of all societies or organizations, public or private, having for their object the protection or aid of children or families, including family counselling services, to the end that the court may be assisted in every reasonable way to give the children and families within its jurisdiction such care, protection and assistance as will best enhance their welfare."

Further, it was incumbent upon the Family Court in light of petitioner mother's motion to set aside the order of filiation and support, and in view of the other circumstances disclosed by surveying the history of the litigation between these parties in Family Court, to appoint a guardian ad litem for the child to protect the child's interest wherever that interest might lie in connection with petitioner's motion. The time has come to recognize the realities of an overburdened Family Court confronted with a paternity proceeding which evinces by its consent nature a pragmatic opportunity to dispose with alacrity another matter on the calendar. The law is quick to protest that it envisions children born out of wedlock as a group so distinct from children born in wedlock that, apart from inheritance and kindred matters, the stigma of such birth in legal contemplation, but not in name, may serve as a predicate for discrimination. If the protest is not to ring hollow, and if the filiation aspect of the order obtains full import as signifying a critical factor, apart from mere monetary consideration, affecting the child's welfare and destiny, then the instant record, which raises more questions than it answers, well serves as the occasion to cry halt! The best interest of a child (whether born in or out of wedlock) will be

served! Perhaps the day will come where the observation that "[p]aternity cases are in more than one sense the stepchild of the law"[3] will no longer hold true.

Further, apropos of the inadequacy of the record herein are the following comments by the Court of Appeals in a child neglect proceeding (Matter of Jose L. I. v Mildred I., 46 NY2d 1024, 1025-1026): "We take this occasion, however, to comment upon the findings of fact, or lack thereof, made by the Family Court * * * A trial court must state in its decision 'the facts it deems essential' to its determination. (CPLR 4213, subd [b].) * * * In the present case, the Family Court made no findings of fact, concluding only that it was not persuaded that appellant had proved its case * * * Effective appellate review, whatever the case but especially in child visitation, custody or neglect proceedings, requires that appropriate factual findings be made by the trial court—the court best able to measure the credibility of the witnesses. This weighty responsibility cannot be shirked, as in this case, by reference to an ultimate conclusion of the court rather than a statement of its required findings of fact" (emphasis supplied).

In Matter of Hawthorne v Edward S. (31 AD2d 426, 428) which involved a paternity proceeding, the appellate court in commenting upon the absence of findings in the record, stated: "We are impelled to emphasize the legal and practical necessity of an informative decision, to point out that the factors peculiar to a filiation proceeding require particular care in the evaluation of the evidence and in the preparation of detailed findings. There is a clear necessity for adherence on the part of the Family Court to comply with the requirement that a decision shall embody adequate findings (Family Ct. Act, § 165; CPLR 4213, subd. [b]; Matter of Gray v. Rose, 30 A D 2d 138; Rodoe v. Noneus, 23 A D 2d 212)" (emphasis supplied).

In determining that the instant record is sufficiently clear and that the child's best interest may be discounted for purposes of even the closely limited hearing urged by this dissent, the majority have viewed the matter as, in effect, involving an alternative to a hearing on the merits, however, restricted, i.e., as one involving some aspect of summary judgment relief. Thus, they discount the moving papers of petitioner because they consist of an affidavit by counsel only

3. Cohen: Elements of Proof of Paternity, Queens Bar Bulletin, vol 39, Jan. 1976, p 5.

(not one by petitioner), supported by a doctor's letter, signed by the doctor rather than by an affidavit from the doctor and give binding effect in legal contemplation to respondent's conclusory affidavit in opposition. To support this result as not raising in the context of the record, factual issues warranting some exploration, however circumscribed, the majority cite as support cases involving summary judgment relief, to wit, *Capelin Assoc. v Globe Mfg. Corp.* (34 NY2d 338, 342) and *Pathmark Graphics v J. M. Fields, Inc.* (53 AD2d 531, mot to dismiss app granted 40 NY2d 1093). The analogy to summary judgment cases is not apposite. Assuming respondent by his affidavit in opposition, wherein he conclusorily states that he is the father, but fails to dispute in any fashion the assertions as to blood types contained in the doctor's letter, be considered as seeking summary judgment (an alternative to a hearing [however limited] on the merits) dismissing the petitioner's application, it is clear that petitioner's own papers—the affidavit of her counsel *and* the doctor's letter are sufficient to defeat summary disposition (see *Esteve v Abad,* 271 App Div 725; *Crowley's Milk Co. v Klein,* 24 AD2d 920; *Moskowitz v Garlock,* 23 AD2d 943). Indeed, the drastic nature of summary judgment relief is such that "a rule has even arisen which occasionally permits the court to consider incompetent evidence, i.e., evidence which would be inadmissible at a trial, if it tends to defeat the motion" (Siegel, New York Practice, § 281, p 338).

Obviously, the State has a well-perceived desire to foist the onus of support for a child out of wedlock on the child's father so as to avoid the child's becoming a charge on the public purse. Now that the filiation aspect of an order of filiation and support is looming large in terms of conferring rights to control the child's destiny, an evolutionary legal process not necessarily envisioned by the legislators in originally promulgating the paternity statute, it might be best to give pause and consider the realities of the situation and not engage in a fiction, legal or otherwise. Thus, in the area of consent filiation proceedings where now for the first time a putative father may even waive the hearing (Family Ct Act, § 564), it might be advisable to make the blood grouping test mandatory. This is certainly a matter for the Legislature to consider in light of the best interest of the child and the growing relevance of filiation orders to direct control of the child's destiny. It is well recognized that a party, not the natural parent of a child

seeking a parental relationship with the child in terms of support, control and related matters, may seek establishment of such relationship by way of adoption. To perhaps achieve the same end result by virtue of an order of filiation in a context not permitting of the reasoned safeguards which surround a lawful adoption and by engaging in a legal fiction to which the court is made accomplice that a party, while not the natural parent, will be regarded as the natural parent by virtue of an order of filiation, is to embark on a dangerous course.

That such course is not being engaged in by our legislators and that they are motivated by genuine concern for the best interest of a child born out of wedlock, may be seen in the recent enactment of a law which makes it easier for such child to inherit from his intestate father and paternal kindred (NY Legis Doc, 1979, No. 65[L], S Intro No. 2220, A Intro No. 3659, signed by the Governor [The New York Times, May 31, 1979, p B6, col 1]). Under this new law, the necessity of an order of filiation is dispensed with and, as an alternative, the father need only sign a document recognizing paternity. The Law Revision Commission, in recommending this legislation, stated: "The apparent public policy of New York is *to expand the rights* of * * * children [born out of wedlock][4] to bring them closer to those of legitimate children" (McKinney's Session Law News of New York, April, 1979, No. 2, p A-129; emphasis supplied). It is in the same spirit and, incidentally, to the end that fraud may be prevented or discouraged, that the dissent urges a limited hearing on the issues raised by petitioner's motion.

It is hoped that today the old conception of a paternity proceeding as designed chiefly to spare the public the expense of supporting the child has yielded to a more enlightened view —one which gives full credence to the child's best interest and removes the vestiges of the gross discrimination practiced against the child born out of wedlock at common law. As noted in *"Saks" v "Saks"* (189 Misc 667, 668): "Unfortunately * * * [birth out of wedlock][5] is regarded as a stigma upon the child. The stigmatization should be applied * * * to * * * the mother and father, rather than to the child."

The obverse of the situation presented on this appeal is

---

4. See section 59 of the General Construction Law.
5. See section 59 of the General Construction Law.

disclosed in *Matter of Louise S. v William P.* (42 AD2d 962), wherein the respondent putative father who had admitted paternity, i.e., consented to an order of filiation which was made after a hearing, subsequently moved to vacate that order of filiation. The Appellate Division, Second Department, reversed the order of Family Court denying the respondent's motion and granted a new hearing on the ground that respondent was not represented by counsel though he was advised of his rights. It was also noted that the petitioner mother had waited more than two years after the child was born to commence the paternity proceeding.

The comments of the majority in this matter have impelled me to make the following concluding observations:

In asking the question, "to what avail" a remand for a hearing on the issues raised by the petitioner's motion serves, *without answering such inquiry,* the majority imply that the record is so complete, the merits so sufficiently delineated that it must be concluded that *no purpose* would be served by a remand for a hearing herein. It suffices to state that I have seriously endeavored to reflect on the policy considerations underlying the purpose of paternity proceedings and the emerging significance of the filiation aspect as compared or contrasted with the support aspect of an order of filiation and support. We are concerned with the search for truth because justice, indeed law itself, not based on truth, will not endure. Justice speaks not only to the mind, but also to the heart—it echoes the whole man, not only part of him. Thus, in a studied effort to adhere to the guiding principle that truth is the handmaiden of justice, this dissent, it is hoped, serves as an articulate response to the majority's query—"to what avail?"

The use by the majority of literary phraseology and skillful semantic constructs creates an aura tending to favor the respondent and to ascribe to him, by implication, such virtues as wisdom and a willingness to assume responsibility, while at the same time tending to portray petitioner in negative terms. Motives arising from within the human breast are subjective and may be gauged in part by objective criteria. Of course, motives, where relevant, have a bearing on the search for truth and the proper dispensation of justice. Equally true, motives may not be ascribed to petitioner ex parte without the realization that respondent also entertains, as do his fellow men, motives of his own. Not being a party to the thoughts and goals of petitioner and respondent, I cannot describe their

motivation with any degree of certitude. Respondent may be a paragon among men and petitioner, equally so, among women. I do not know, and the record does not permit a reasoned guess or estimation.

What is clear from the record is that the child, who, common sense dictates, would be the natural object of his father's affection, appears to "occupy" the status of a battlefield or vehicle upon or through which the enmity of two adults clash. Obviously, the appearance of a danger to the child's health, both physical and mental, lurks in this record and the "lip service" paid to the best interests of the child concept by the majority gives the appearance, but not the substance of concern for the child's true welfare.

The majority assert that "[t]he child should not be kept in limbo." I wholeheartedly agree, and merely add with equal fervor that the child should not be *cast into* limbo—that area which poets and medieval theology tell us borders on hell. To the extent that the majority choose to regard the instant record as foreclosing petitioner from any hearing, limited as hereinabove set forth, I depart from them and decry that rationale which might perpetrate a real "limbo" in the name of the child's best interests.

Reflection upon the occasions in which a putative father has successfully urged a hearing on issues raised by his subsequent motion attacking an order of filiation and support entered on consent and the apparently cavalier treatment accorded the mother's endeavor to obtain similar relief in the instant matter, might inspire the conclusion that a double standard is employed. Apart from any consideration of the best interest of the child, an ambience may be perceived by which the female of the species is regarded as more culpable and more determinative in the generation of a child out of wedlock. For choosing to foist on a particular man as respondent in a paternity proceeding the onus of support for the offspring and later attempting to vacate the consent order of filiation and support, a certain lack of sympathy attaches to the mother. She is met with the cry—why claim paternity in the first instance against the unfortunate respondent? A respondent, however, subject to a consent order of filiation and support is the beneficiary of a certain sympathy in his endeavor to subsequently be free of the order of filiation and support. Law is vital and evolutionary, and mirrors in its seamless web the changing mores and values of society, as

well as the constant truths of human nature. In contemporary times, the consciousness of society evoked by the movement termed "woman's lib", may, insofar as proper and relevant, impinge upon the legal life of that society to the extent at least that in paternity proceedings there is no sympathy, bias or subjective tinge which might disrupt the search for truth and the swift realization of the child's best interest.

Indeed, *Matter of Monteleone v Antia* (60 AD2d 603), cited by the majority, serves as an apt example of the possible "double standard" alluded to above. In that case, the Family Court on motion of the respondent husband in a child support proceeding initiated by the wife some 14½ years after a Mexican divorce decree, granted the taking of blood grouping tests of the parties and the children, respondent for the first time having attacked the paternity of the issue born during the period the parties were married. The appellate court held this relief to be an abuse of discretion and condemned the implication that blood grouping tests must be granted under all circumstances on application of the husband (see *Moore v Moore*, 49 AD2d 768). The court declared: "Here the respondent [husband] waited for almost 15 years after the rendition of a Mexican divorce decree, which he obtained, and which incorporated in its findings of facts supporting the decree, that William and Philip were the 'issue' of the marriage, before resisting support on paternity grounds. Equitable estoppel precludes the respondent from compelling another party to take blood grouping tests under such circumstances" *(Matter of Monteleone v Antia, supra,* p 603). Thus, any implicit bias favoring one party over another was effectively frustrated by proper application of the doctrine of equitable estoppel. Despite the salutary admonition of the *Monteleone* case, the majority choose to apply its rationale to petitioner herein, ignoring the spirit of *Monteleone* and the inappositeness of the circumstances herein. Petitioner June B. did not wait 15 years or even 10 years, but in less than one year, i.e., within 10 months, sought to obtain blood grouping tests. It is the studied avoidance of the policy considerations underlying paternity proceedings and the best interest of the child mandate which prompts the inappropriate application of *Monteleone*. Refusal to concentrate on the outward manifestation of a legal problem and the urge to pierce to its essential element is a laudable goal. The instant appeal, striking so close to a concern reflective of the best and the worst in society's evolving passion, invokes realization of that goal.

Accordingly, the order of the Family Court, New York County (THURSTON, J.), entered December 20, 1978, which denied petitioner's application to set aside an order of filiation and support entered on consent of the parties on November 7, 1977, should be reversed, on the law, without costs and disbursements, the petitioner's application should be granted to the extent that the matter be remanded for a full hearing on the issues raised by such application, and a guardian ad litem should be appointed for the child.

MURPHY, P. J., FEIN and SILVERMAN, JJ., concur with KUP-FERMAN, J.; LUPIANO, J., dissents in an opinion.

Order, Family Court, New York County, entered on or about December 20, 1978, affirmed, without costs and without disbursements.